UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JD NORMAN INDUSTRIES, INC.,

          Plaintiff,

                              Case No.15-13863

vs.                               Paul D. Borman
                               United States District Judge

METALDYNE, LLC ,             David R. Grand
                               United States Magistrate Judge

          Defendant.

_____/

OPINION AND ORDER
GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65(b) (ECF NO. 17)

This diversity action was originally filed in November 2015 by Plaintiff JD Norman Industries, Inc., an automotive supplier, against Defendant Metaldyne LLC, its exclusive supplier of connecting rods. (ECF No. 1.)

Now before the Court is Plaintiff JD Norman Industries, Inc.'s Emergency Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction filed on April 19, 2016 (ECF No. 17).[1] Plaintiff alleges that Defendant refuses to ship automotive parts to Plaintiff pursuant to their long-term exclusive supply contract. Defendant filed a response to the Motion on April 20, 2016. (ECF No. 21.)

A hearing was held on Thursday, April 21, 2016 at which the Court heard oral argument from both parties. At the conclusion of the hearing, the Court granted Plaintiff's request for a TRO. The Court now issues this Opinion and Order in support of its oral ruling.

_____

[1] On Tuesday, April 19, 2016 the Court granted Plaintiff's concurrently filed Motion for Leave to File its Amended Complaint (ECF No. 16). (ECF No. 20, Order.)

## I. BACKGROUND

A.      The Parties

Plaintiff JD Norman is a "leading manufacturer of highly engineered metal components and systems" and services Original Equipment Manufacturers "OEMs" in the United States and abroad.  (ECF No. 18, Pl.'s Br., Ex. 1, Norman Decl. ¶ 3.)

Defendant Metaldyne is in the business of "manufacturing highly engineered metal-based products for the global light vehicle markets, and [] its advanced process technologies are used in performance-critical powertrain applications, including powder-metal connecting rods, VVT components, balance shaft systems, engine crankshaft dampers, net forged differential gears and pinions, differential assemblies, valve bodies, hollow shafts, clutch modules and end cover." (ECF No. 4, Def.'s Answer, ¶ 8.)

B.      The Parties' Agreements and Relationship

On June 28, 2013, Plaintiff acquired Federal-Mogul's Windsor, Canada plant.  (Ex. 2, 6/28/13, Asset Purchase Agreement.)  Included in the asset purchase agreement were two Letter Agreements executed in July 2011 between Federal-Mogul and Defendant wherein Defendant agreed to be Federal-Mogul's exclusive supplier for raw connecting rods ("Con Rods") for Chrysler's Tigershark program.  (Norman Decl. at ¶ 5; Ex. 3, 7/28/11 Letter Agr. 2.0L; Ex. 4, 7/28/11 Letter Agr. 2.4L (collectively "Letter Agrs."))  The Letter Agreements provided that Defendant was "nominated" as a "potential Federal-Mogul business partner of Part Number(s) 05047575AA Con Rod, on the Chrysler Tigershark 2.0L program" (Ex. 3) and for "Part Number(s) 05047574AA Con Rod, on the Chrysler Tigershark 2.4L program" (Ex. 4).  Scott Jorgens signed the "Supplier Acknowledgment" on both Letter Agreements on behalf of

Defendant on July 28, 2011.  (*Id.*)  Both Letter Agreements contemplated a program life of five years and provided that the supplier was "intended to be the exclusive supplier" of the connecting rods.  (*Id.*)

In July 2013, pursuant to the Asset Purchase Agreement, Plaintiff assumed Federal-Mogul's role in supplier to the Chrysler Tigershark 2.0L and 2.4L programs.  (Norman Decl. ¶ 5.)  It is undisputed that since approximately July 2013, Plaintiff regularly issued purchase orders to Defendant on the Tigershark Programs as well as other programs for different OEMs. Defendant is the sole approved supplier for the Tigershark Con Rods.  (Norman Decl. ¶ 6.)

Plaintiff notes that it follows the "just in time" model for automotive supply wherein it keeps extremely low volumes of inventory which allows for faster design changes and lower inventory costs.  (*Id.* at ¶ 7.)  With regards to the Tigershark 2.4L program, Defendant is both Plaintiff's supplier, and also a competitor, because Defendant is a "dual source provider," and "capable of supplying FCA up to 1.6 million Con Rods per year, which should cover the demand in the short term if needed."  (Def.'s Resp., Ex. C, Monroe Aff. at ¶ 30.)

C.    This Litigation

Plaintiff asserts that the Letter Agreements with Defendant are binding contracts.  These Letter Agreements provide for certain pricing adjustments and rebates during the contract life that are related to (1) increased efficiencies and technological advancements over the course of the five year supply term, and (2) provide for price reductions or increases based on the fluctuating costs of scrap steel and copper.  (Norman Decl. ¶ 10; Letter Agrs. at 1, 3.)  Through mid-2015 Plaintiff alleges that it attempted to enforce these price adjustment and rebate terms but Defendant refused, unless the adjustment was in its favor.  Plaintiff also alleges that

3

Defendant threatened to halt production unless Plaintiff paid, what Plaintiff considered, inflated prices.  (Norman Decl. at ¶ 12-13.)

In November 2015, Plaintiff filed the present action alleging that the Letter Agreements regarding the Tigershark Programs were binding valid contracts and that Defendant breached those contracts by failing to honor the price adjustment and rebate terms.  (ECF No. 1.) Defendant disputed that the Letter Agreements constituted binding contracts and countersued Plaintiff, alleging, in the alternative, that if the Letter Agreements were binding contracts that Plaintiff had breached those contracts based on late payments and low volumes.  (ECF No. 4, Ans.)

Since Plaintiff's action was filed, the parties continued to conduct business on the Tigershark Programs and attempted to resolve the pricing dispute, until the Defendant unilaterally terminated the contracts this month.

D.     Cancellation of Tigershark 2.4L Program

Plaintiff asserts that during the parties' attempts at reconciliation, Defendant made a "show of good faith" and indicated that it would honor the raw material price adjustments. Based on this representation, Plaintiff issued revised purchase orders from January and February 2016 incorporating approximately $38,000 in adjustments in Plaintiff's favor.  (Norman Decl. ¶¶ 15-16; Def.'s Resp. Ex. A, Tigershark 2.4L POs with adjustments; Ex. D, Debit Memo.) Defendant contends that Plaintiff revised its Tigershark 2.4L purchase orders reflecting the $38,000 in adjustments for January and February 2016 without authorization from Defendant. (Monroe Aff. ¶¶ 5-6.)  Defendant claims that it made clear to Plaintiff in a March 7, 2016 email that Defendant did not authorize the price adjustments and that any retroactive surcharges would

4

be addressed during facilitation.  Further, any adjustments that would be allowed would not be

retroactively applied and any such adjustments had to be agreed upon by both parties.  (Monroe

Aff. ¶¶ 7-9.)

On or about March 25, 2016, Plaintiff issued a $38,000 "debit" for the retroactive

surcharge based on the revised January and February purchase orders and price adjustments.

(Def.'s Resp. Ex. D, Debit Memo; Norman Decl. ¶ 16.)  Defendant ordered Plaintiff to reverse

the $38,000 debit; Plaintiff refused to do so.  (Def.'s Resp. Ex. E, 2/25/16 Email; Ex. F 2/28/16

Email.)

Two days later, Defendant halted shipments to Plaintiff.  (Norman Decl. ¶ 17, stating

shipments were halted on 3/30/16; Pl.'s Br. Ex.  6, 4/4/16 Ltr., stating that Defendant had halted

shipments as of 3/31/16.)  Plaintiff claims that Defendant turned away its trucks that had come to

pick up an ordered shipment at Defendant's plant because of the disputed $38,000 adjustment.

(Norman Decl. ¶ 17.)  Plaintiff then quickly relented and offered to pay the "the price Metaldyne

demanded, without prejudice to our claims in this lawsuit."  (Norman Decl. ¶ 17.)

On Friday, April 1, 2016, Defendant sent Plaintiff a letter demanding "reasonable

assurance of performance" pursuant to Mich. Comp. Law § 440.2609.  (Pl.'s Br. Ex. 5, 4/1/16

Ltr.)  Defendant alleged that Plaintiff was $802,671.73 past due on payments to Defendant on a

number of programs, including the Tigershark 2.4L program.  These invoices were all 1-30 days

overdue.  (*Id*.)  Defendant asserted that because Plaintiff had "repeatedly delayed in paying the

amount owed" it had reasonable grounds for insecurity and requested that Plaintiff confirm in

writing within one business day that it would pay Defendant for all parts on a timely basis.  (*Id*.)

5

Plaintiff responded to Defendant's letter on Monday, April 4, 2016, and noted that it was "curious" that the letter was issued two days after Defendant halted shipments to Plaintiff. (Pl.'s Br. Ex. 6 at *1.)  Plaintiff asserted that Defendant's demand was unreasonable when viewed in the context of the parties' long-term commercial relationship and did not provide Plaintiff a reasonable response time.  (*Id*. at *1-2.)  Further, Plaintiff asserted that it had: "never refused to pay for parts shipped or intimated at an inability to pay.  JD Norman will pay Metaldyne for all goods that Metaldyne has shipped, or will in the future ship, to JD Norman consistent with the parties' agreed-upon pricing as set forth in the Letter Agreements."  (*Id*. at *1)  Finally, Plaintiff concluded its response letter by demanding reasonable assurances of performance from Defendant based on Defendant's refusal to ship goods on March 31, 2016.  (*Id*. at *2.)

Defendant does not acknowledge that any shipments were halted prior to the April 1, 2016 demand letter.  Defendant represents that it suspended shipments on programs with overdue accounts after Plaintiff failed to give adequate assurances, on or about April 7, 2016. (Monroe Aff. ¶ 20.)

Plaintiff alleges that on Thursday, April 7, 2013, it provided adequate assurances to Defendant, and agreed that it would reverse the January and February adjustments, and pay all overdue amounts, and commit to paying invoices in a timely manner.  (Def.'s Resp., Ex. I, 4/7/16 Email.)

On Monday April 11, 2016, Defendant sent Plaintiff an email indicating that Plaintiff was still in arrears in the amount of $191,359.79 and that it expected payment that day.  (Def.'s Resp. Ex. J, 4/11/16 Email.)  Defendant also noted General Motors had contacted it on Friday and relayed that Plaintiff represented to GM that it was "completely current" on payments and that

Defendant was "holding GM shipment solely in relation to another OEM." (*Id*.)  Defendant objected to this "inaccurate information." (*Id*.)

Defendant did not receive a response from Plaintiff regarding its remaining outstanding invoices.  Then, on Wednesday April 13, 2016, Defendant's Vice President of Sales and Engineering, George Lanni, sent Plaintiff a letter cancelling the contracts between the parties "for which payments remain overdue and owing" to Defendant, specifically the Tigershark 2.4L Program and the GM Gen V 6.2L Program.  (Pl.'s Br., Ex. 7, 4/13/16 Ltr., ("Cancellation Letter").)  Defendant provided that as of April 12, 2016 there were four invoices that remained outstanding totaling $264,878.92.  (*Id*. at *2.)  Three of those invoices were late by three days, one day, and four days; the fourth invoice was due that day, April 12, 2016.  (*Id*.)  Defendant asserted that Plaintiff's failure to timely pay was a repudiation of the contracts and constituted a material breach of the contracts.  (*Id*. at *2-3.)  Defendant concluded the Cancellation Letter by inviting Plaintiff to reach out if it wished "to discuss the required new terms of possible future contracts, for any future supply" of the GM Gen V 6.2L component or the Tigershark 2.4L component.  (*Id*. at *3)

Plaintiff issued a remittance in the amount of $263,296.67 on April 13, 2016 to Defendant.  (Monroe Aff. ¶ 26.)  Defendant alleges that on April 18, 2016, Plaintiff was again in arrears in the amount of $381,113.02 on certain GM programs.  (*Id*.)  On April 19, 2016, the day Plaintiff filed the present action, Plaintiff had become current on its payments.  (*Id*. at ¶ 27.)

E.      Effect of Dispute

Plaintiff seeks TRO injunctive relief with respect to the Tigershark 2.4L canceled

7

contract.[2]  (*See* Pl.'s Br. Ex. 9, Proposed TRO, indicating that Plaintiff is only seeking to compel delivery of Chrysler-specific Con Rods.)  Plaintiff asserts Defendant's refusal to deliver products will shut down its Chrysler production line in its Windsor plant almost immediately, to wit, as soon as April 27, 2016.  That shutdown will also result in the layoff of employees and expose Plaintiff to "line down" penalties from Chrysler which could bankrupt Plaintiff within a week. (Norman Decl. ¶ 21.)

Defendant represents that Chrysler will not suffer any harm, nor is there any risk of a Chrysler production line disruption because, as noted above, Defendant is a "dual source provider" and can step into Plaintiff's shoes and directly supply Chrysler with the Tigershark 2.4L component in the short term as needed.  (Monroe Aff. ¶ 30.)

## II.  STANDARD OF REVIEW

It is the plaintiff's burden to demonstrate entitlement to preliminary injunctive relief and that burden is a substantial one.  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).  "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion."  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

---

[2] Although Defendant cancelled the GM Gen V 6.2L program, Defendant is currently providing Plaintiff with GM parts pursuant to "spot buy" purchase orders issued by GM, whereby Defendant "is providing parts as needed to JDN and GM is paying for those parts." (Monroe Aff. ¶ 29.)  Thus, Plaintiff is not at risk of any irreparable harm regarding this program.

A district court must consider four factors when deciding whether to issue a injunctive relief:

> (1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a [an injunction] would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a [an injunction].

*Leary*, 228 F.3d at 736 (quoting *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (*en banc*)). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cnty. Government,* 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted).

## III. ANALYSIS

### A.      Likelihood of Success on the Merits

"In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success.  However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citations omitted).

While federal law applies as to the factors considered in granting injunctive relief, the Court must apply Michigan law to evaluate whether Plaintiff has a substantial likelihood of success on the merits of its underlying diversity action.  *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.,* 511 F.3d 535, 541 (6th Cir. 2007) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  In the present action, the parties do not dispute that Michigan law controls this contract dispute.  (*See* ECF No. 4, Ans., at ¶¶ 8, 9.)  Also, assuming the Letter Agreements are binding, those Letter Agreements provide that Michigan law is

9

controlling.  (*See* Exs. 3, 4, Ltr. Agrs.)

　Pursuant to Michigan law, the elements of a breach of contract claim are "(1) the existence of a valid contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury." *Keiper, LLC v. Intier Auto. Inc*., 467 F. App'x 452, 459 (6th Cir. 2012) (citing *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003)).  The "essential elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreements, and (5) mutuality of obligation." *Thomas v. Leja*, 187 Mich. App. 418, 422 (1991).

　Plaintiff alleges that the two Letter Agreements constitute valid and enforceable contracts that were validly assigned to Plaintiff by Federal-Mogul through the 2013 Asset Purchase Agreement.  (Am. Compl. ¶¶ 43-44; Norman Decl. at ¶ 5.)  Plaintiff notes that the Letter Agreements set forth the obligations of both parties and are signed by the parties.  (Exs. 3, 4, Ltr. Agrs.)  Defendant disputes that these Letter Agreements are valid contracts but admits that Plaintiff had repeatedly submitted purchase orders for the Con Rods specified in the Letter Agreements and Defendant had filled those purchase orders.  (ECF No. 4, Def.'s Ans., at ¶22.)

　Plaintiff asserts that it has fulfilled its obligations under the Letter Agreements, but Defendant breached the Letter Agreements by failing to deliver the Con Rods Plaintiff ordered. Plaintiff also argues that Defendant's conduct constitutes an improper anticipatory repudiation of the Letter Agreements and is a breach of its obligation of good faith and fair dealing under Mich. Comp. Laws § 440.1304.

10

Defendant acknowledges that the present motion is not one for summary judgment, and does not dispute at this time the issue of whether the Letter Agreements were binding.  Rather, Defendant only raises the argument that Plaintiff is unlikely to succeed on the merits of its claims before this Court because Plaintiff first substantially breached the Tigershark 2.4L contracts by failing to timely pay its invoices.  (Def.'s Br., at *7 n.1, *20-21.)  Defendant argues that failure to timely pay, especially after giving reasonable assurances, constitutes a scenario where Defendant was entitled under both Mich. Comp. Law §§ 440.2609 and 440.2703 to cancel the contract.

The Sixth Circuit has explained:

> Michigan law is settled: "He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform."  *Ehlinger v. Bodi Lake Lumber Co.*, 324 Mich. 77, 36 N.W.2d 311, 316 (1949), *quoting Jones v. Berkey*, 181 Mich. 472, 148 N.W. 375, 378 (1914). The determining factor in Michigan breach of contract cases and in this case is therefore whether a first breach is "substantial."  The Michigan Supreme Court has explained that a "substantial breach" is one "where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party." *McCarty v. Mercury Metalcraft Co.*, 372 Mich. 567, 127 N.W.2d 340, 343 (1964).

*Chrysler Int'l Corp. v. Cherokee Exp. Co.*, 134 F.3d 738, 742 (6th Cir. 1998); *see also Baith v. Knapp-Stiles, Inc.*, 380 Mich. 119, 126 (1968).  The determination of whether a breach is "substantial" is "inextricably tied to the particular facts of the case."  *Id.*  Courts in this district have recognized that "late payment, or non-payment, of some invoices" does not constitute a "substantial breach" in the context of an automotive supply relationship.  *See Eberspaecher N. Am., Inc. v. Nelson Global Prods., Inc.*, No. 12-11045, 2012 WL 1247174, *4 (E.D. Mich. Apr. 13, 2012) (Cleland, J.); *Coupled Prods. LLC v. Component Bar Prods., Inc.*, No. 09-12081, 2012

11

WL 954646, *3 (E.D. Mich. Mar. 21, 2012) ("Courts have held that failure to timely meet payment does not constitute a substantial breach.").

Michigan's UCC provides that "when reasonable grounds for insecurity arise" a party may demand in writing adequate assurance of performance and "if commercially reasonable suspend any performance for which he has not already received the agreed return." Mich. Comp. Laws § 440.2609(1). "[T]he reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards." Mich. Comp. Laws § 440.2609(2). Plaintiff contends that even allowing that it was late on the alleged 20 accounts as of April 1, 2016, the amount at issue was a very small amount in the context of the parties' on-going three year relationship, and this undercuts Defendant's claim that it was entitled to seek reasonable assurances under Mich. Comp. Law § 440.2609. Plaintiff also argues that Defendant has miscalculated the invoice payment date due to a different interpretation of "net 70 from receipt of shipment." (Exs. 3, 4, Ltr. Agrs.)  This centers around the issue of whether the 70 days begins when the Plaintiff's truck arrives at Defendant's plant for pick up, or when it delivers the parts at Plaintiff's plant.

While the Court finds that Defendant's demand for reasonable assurances of performance on April 1, 2016 may not be reasonable given the longevity of the parties' relationship and Plaintiff's history of full payment – the amount of alleged late payments was only .007% of the $38.2 million dollars paid by Plaintiff over the last three years – at this stage of the proceedings the Court will accept Plaintiff's depositing of $300,000 in escrow with the Court to assure its compliance under the contracts.

It is undisputed that Plaintiff is now current with its invoices, and the four late invoices cited in the April 13, 2016 Cancellation Letter were all less than four days late.

Defendant relies upon Mich. Comp. Law § 440.2703 to justify the cancellation of the Tigershark 2.4.L Program.  Section 440.2703 provides in pertinent part, that when a buyer "fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract[], then also with respect to the whole undelivered balance" the seller may cancel.  Mich. Comp. Law §440.2703(f).  The Court finds that, as discussed *infra*, there is not a substantial breach of the contract(s).  There remain significant issues as to what payments were due and when.

The Court concludes that Plaintiff has raised a number of questions as to the merits of its breach of contract claims that are so "serious, substantial, difficult and doubtful" that "make them fair ground for litigation." *Six Clinics Holding*, 119 F.3d at 402, to wit, the case law supporting Plaintiff's position that its "late" payments in this context do not constitute a first "substantial breach."  The Court finds that Plaintiff has established a likelihood of success on the merits of its claims and this factor weighs in favor of Plaintiff.

> B.    Irreparable Harm

Plaintiff bears the burden in showing that in the absence of an injunction it will "suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc*., 443 F.3d 540, 552 (6th Cir. 2006).  An irreparable harm is one that is "not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Plaintiff claims that if Defendant stops shipment of raw Con Rods under the Letter Agreements, it will be unable to continue to manufacture engineered Con Rods for Chrysler. This will result in a domino affect such that Chrysler's production lines will be halted and, more specifically, that the production of the Jeep Cherokee, Chrysler 200, and Dodge Dart (that all use the Tigershark engine) will be stopped.  Plaintiff also claims that the withholding of shipments of raw Con Rods will also shut down its Windsor plant and result in employee layoffs for Plaintiff and eventually for Chrysler.  (*See* Norman Decl. at ¶¶ 21, 23)  Additionally, Plaintiff alleges that the supply chain for vehicles that utilize Chrysler's Tigershark engines will be disrupted and would likely cause Chrysler to stop purchasing other parts from different suppliers who rely on Chrysler to support their businesses.  The closure will also result in "line down" penalties against Plaintiff from Chrysler which would bankrupt Plaintiff within a single week.  Plaintiff further asserts that these events will "forever tarnish" Plaintiff's goodwill and reputation, damage its relationship with Chrysler, expose it to default under the terms of its credit facility, and possible claims by third parties (including Chrysler).  (*Id*. at ¶ 23.)

Defendant argues that Plaintiff's harms are not irreparable and could be remedied with money damages.  Further, Defendant asserts that Chrysler will not suffer any production disruption because Defendant, as a dual source supplier, can provide Chrysler with its needed engineered Con Rods.

In the *Eberspaecher* case before United States District Court Judge Robert Cleland, an analogous automotive supply contract action, the district court recognized that a supplier's delay or failure to ship product has "immediate and dramatic consequences" and can result in the lay off of employees, interruption in production schedules, shut down of assembly lines and possible

14

damage claims against the supplier.  *Eberspaecher*, No. 12-11045, 2012 WL 1247174, *5 (E.D. Mich. Apr. 13, 2012) (citation omitted).  That *Eberspaecher* court also rejected any argument that these harms were speculative because the nature of the "just in time" automotive supply chain and its vulnerability to disruption were "well established" in this district.  *Id*., at * 6 (citing *Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp*., 749 F. Supp. 794, 798 n. 7 (E.D. Mich. 1990)).

In the present case, the foreseeability and the likelihood of a production line shutdown and the imminent threat of Plaintiff's bankruptcy are generally established in this "just in time" automotive supply context.  This fact differentiates this action from cases in which courts have found no irreparable injury.  *See e.g, Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991) (upholding a district court's denial of injunctive relief despite the plaintiff's vague allegations that without injunctive relief, the contract breaches would lead to a decline of confidence in the milk cooperative, which would lead to difficulty in acquiring milk, a loss of customers, and ultimately the dissolution of the collective.)  In the instant case, Plaintiff's claims are specific. Plaintiff claims that it will take at least nine months to source the Con Rods it needs from another supplier but just one week of fines from Chrysler will put Plaintiff into bankruptcy. Additionally, the Court notes that Plaintiff's potential loss of goodwill and harm to its reputation due to a halt in production or inability to fulfill its obligations to Chrysler constitutes a irreparable injury.  *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute.")

Defendant argues that Plaintiff has been hoist upon its own petard and Plaintiff could remedy any potential harm by negotiating new contracts with Defendant.  Defendant relies upon a different *Eberspaecher* case, *Eberspaecher N. Am. Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592 (E.D. Mich. 2008) (Edmunds, J.), wherein the district court held that the automotive company would not suffer irreparable harm because it could alleviate the harm by "covering," and paying the defendant Tier 2 supplier's demanded price increase and pursue money damages with later litigation.  *Id*. at 600.  In the present action, Defendant contends that it is available to meet with Plaintiff and negotiate a new connecting rod contract with different terms, in essence, renegotiate the terms of the existing Tigershark 2.4L contract and continue the current litigation.  This offer assumes that the Court will support Defendant's claim that Plaintiff committed a substantial breach of the existing contract.  The Court does not find a substantial breach.

In *Eberspraecher v. Nelson* (Cleland, J.), *supra*, the district court distinguished *Eberspraecher v. Van-Rob* (Edmunds, J.):

> The court does not find *Van-Rob* persuasive.  The UCC defines "cover" as "any reasonable purchase of or contract to purchase goods *in substitution for* those due from the seller."  Mich. Comp. Law § 440.2712(1) (emphasis added).  In the court's view this must mean that a buyer is obligated to search for an alternative source of supply other than the breaching seller.  Otherwise, the obligation to <u>cover</u> would reward a breaching seller's efforts at extorting a price increase by mandating that the buyer pay that price, at least for a time.  This would be a troubling result....

*Eberspaecher v. Nelson*, at *6 (emphasis added).  The Court finds this analysis in *Eberspaecher v. Nelson* persuasive.  Defendant is arguing that Plaintiff must negotiate a new contract with likely increased price demands, or face imminent irreparable harm because it could not cover its contract.  Like the court in *Eberspaecher v. Nelson*, the Court finds the endorsement of such an interpretation of "cover" would lead to "troubling results."  Further, it is undisputed that

16

sourcing the Con Rods from a different manufacturer, other than Defendant, would take at least nine months and therefore the length of time Plaintiff would potentially be subjected to Defendant's new contract terms is a significant amount of time. *See Key Safety Sys., Inc. v. Invista*, 2008 WL 4279358, at *12 (E.D. Mich. Sept. 16, 2008) (distinguishing *Van-Rob* on the basis that the product was a unique safety product that would take six to nine months of certification procedures and require it to re-qualify 31 different vehicle airbags and therefore the risk of harm was greater.)

Finally, as to whether Plaintiff is entitled to specific performance, Mich. Comp. Laws § 440.2716 provides that "specific performance may be decreed where the goods are unique or in other proper circumstances." Defendant does not appear to dispute that the goods at issue, the Tigershark 2.4L Con Rods, are unique goods that cannot be easily sourced by another manufacturer. Rather, Defendant summarily contends that specific performance is not warranted in this action because Plaintiff could be made whole by money damages. Defendant's argument is unpersuasive, given Plaintiff's declaration that it faces an imminent plant shutdown, loss of its contract, destruction of its reputation in the automotive supply business, inability to secure the Connecting Rods elsewhere, and bankruptcy. Therefore, specific performance in this circumstance through a TRO is justified. *See Key*, 2008 WL 4279358, at *12 (noting that the comments to the UCC provide that specific performance may be warranted where there is a requirements contract or the good could not be "covered" elsewhere.)

Thus, the Court finds Plaintiff will suffer an irreparable injury if the TRO is not issued. This factor weighs in Plaintiff's favor.

C.       Possibility of Substantial Harm to Others

Defendant argues that it would suffer substantial harm if the Court were to grant Plaintiff's request for a TRO.  Defendant argues that Plaintiff's motion is an attempt to force it to supply parts to it by "terms imposed by this Court" and such a circumstance would be a hardship because it "should not be forced to continue to supply a customer who does not time pay with parts pursuant to the terms of a now-cancelled contract."  (Def.'s Resp. at * 24.)  Defendant further argues that Plaintiff's late payments threaten its financial security.[3]  Defendant asserts that if it decides to continue its business with Plaintiff it should be allowed to negotiate a new contract that will compensate it for the risks associated with Plaintiff's late payments.

The Court finds Defendant's argument unpersuasive.  Plaintiff claims it has been paying inflated prices for its parts (payment without adjustments or rebates required under the Letter Agreements) and therefore continuation of the status quo would not be detrimental to Defendant. Plaintiff notes that it is current on all of its payments and will provide reasonably payment assurance to Defendant with its escrow deposit.  Defendant's April 13, 2016 Cancellation Letter makes clear that Defendant is willing to continue to supply Plaintiff with Tigershark 2.4L Con Rods but only under new terms.  The Court does not accept Defendant's contention that there is no real harm to Plaintiff.  This ignores the fact that Defendant is breaching its contract, destroying Plaintiff's business, and in essence replacing Plaintiff as Chrysler's supplier.  Indeed, it appears that Defendant would be the *only* company in the position to supply Chrysler for at least nine months: Defendant has not disputed Plaintiff's representation that it would take nine

_____

[3] Defendant does not offer any evidence of financial risk related to Plaintiff's past late payments.

18

months for it to source another Tier 2 supplier for the raw Con Rods.

Finally, Plaintiff has offered reasonable assurance: it will deposit $300,000 in an escrow account with the Court as security pursuant to FED. R. CIV. P. 65(c).  This is the approximate amount that Plaintiff pays Defendant on a monthly basis under the Tigershark Programs.  Given Plaintiff's offer of security, the Court finds Defendant's supported claims of possible financial risk unavailing.

The Court finds that Defendant will not suffer a substantial risk of harm if the injunctive relief is granted and this factor weighs in favor of Plaintiff.

D.      Public Interest

Finally as to the public's interest, Defendant argues that the public's interest weighs against granting Plaintiff's request for injunctive relief because Plaintiff should not be rewarded for failing to pay its invoices on time.  Plaintiff contends that the public's interest weighs in its favor because granting the injunctive relief would avoid the shutdown of Plaintiff's Windsor plant, prevent any associated job losses, and presently uphold the contract that Defendant seeks to breach/renegotiate, and enable the parties to resolve the "moving parts" of the contracts, to wit, scrap and copper costs, and any discounts related to increased efficiencies and technological advancements.  Plaintiff argues that it is in the public's interest to prohibit companies from using the threats of halting performance or cancellations of contracts on non-substantial breaches to extort new price terms.  At this time, the Court finds that this factor tips in favor of Plaintiff.

E.      Balancing the Factors

The Court finds that all four factors weigh in Plaintiff's favor, and that Defendant's claim of  financial insecurity related to Plaintiff's late payments, the most recent of which were one,

19

three, and four days late, is all but eliminated with Plaintiff's submission of $300,000 in escrow with the Court.  Accordingly, the Court will grant Plaintiff's Motion for a TRO.

IV. CONCLUSION

For all these reasons and those set forth on the record, the Court GRANTS Plaintiff's Motion for Temporary Restraining Order (ECF No. 17).  Further, Plaintiff's Motion for Preliminary Injunction is CONTINUED until the Court holds an evidentiary hearing on the matter.  The Court notes Defendant filed a response to this motion on April 20, 2016.  Plaintiff's Reply brief is due on May 4, 2016.  An evidentiary hearing on this matter will be scheduled for a later date.

IT IS FURTHER ORDERED that Defendant shall resume shipment of Tigershark 2.4L Connecting Rods to Plaintiff, pursuant to the terms of Plaintiff's pending and forthcoming purchase orders consistent with the parties' course of conduct, *i.e* the previous status quo prior to the cancellation of the contract, and of course, Plaintiff must make its payments timely pursuant to the terms of the contracts.

IT IS FURTHER ORDERED that Plaintiff shall deposit $300,000.00 with the Clerk of this Court within two business days of the entry of this Order.  Pursuant to E.D. Mich. LR 67.1, "[t]he Clerk of Court shall accept only cash, certified check, cashier's check or money order for deposit in an interest-bearing account."  The Clerk of Court is hereby directed to deduct from the account any fee authorized by the Judicial Conference of the United States.

IT IS SO ORDERED.

s/Paul D. Borman<br>PAUL D. BORMAN<br>UNITED STATES DISTRICT JUDGE

Dated:  April 26, 2016

20

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 26, 2016.

s/Deborah Tofil_____
Case Manager